352 So.2d 825 (1977)
Harvey D. HAMILTON and M.L. Farris
v.
Donald R. McGILL.
No. 49510.
Supreme Court of Mississippi.
December 7, 1977.
*826 Troutt & Moore, Nat G. Troutt, Senatobia, Billy J. Gilmore, Lexington, for appellants.
Barrett, Barrett & Barrett, Pat M. Barrett, Jr., Lexington, for appellee.
Before PATTERSON, SMITH and LEE, JJ.
PATTERSON, Chief Justice, for the Court:
This is an appeal from the Chancery Court of Holmes County. There the vendee was denied a rescission of a land and timber contract but was granted an abatement in the purchase price with interest. The vendors appeal from the abatement in price and the vendee cross-appeals from the denial of the rescission.
On September 27, 1974, Donald R. McGill, hereinafter McGill, a resident of Texas, purchased 982.74 acres of land in Holmes County for $296,100 from Harvey D. Hamilton and M.L. Farris. This acreage was known as the Sontheimer Place and consisted of approximately 267 acres of open bottomland, 43 acres of open hill land, and 672 acres of timbered land. A payment of $59,000 was made at the time of purchase and a note and deed of trust were executed by McGill for the remainder. By separate instrument, though part of the transaction, McGill executed a timber deed to Hamilton and Farris in consideration of their transferring certain farm equipment and cattle to him.
Thereafter, McGill operated the Sontheimer Place as a cattle farm and improved it by remodeling the residence thereon as well as hiring a manager for its operation and improvement. Following heavy rains on March 12, 1975, Harland's Creek, which traverses the tract, overflowed, covering the bottomland from hill to hill to a depth of five feet in places. By the next day the flood receded and in its wake left three drowned calves, fence damage and deposits of silt and other debris over the bottomland, causing the grass to be temporarily unfit for cattle consumption.
In his suit for rescission filed a few days later, McGill alleged that Hamilton had represented that the Sontheimer Place did not flood and was not subject to flooding, thereby defrauding him, and that Farris, who was present, remained silent and therefore became equally guilty. He prayed for a rescission of the deed, a refund of the down payment, a refund of the monies expended for improvements, a lien on the land, sale of the land for the satisfaction of *827 any decree for damages, and general relief. The complainant, in his pleadings, offered the return of cattle and equipment but did not offer to return the land or its possession. Hamilton and Farris denied these allegations, demurred and filed a cross bill seeking damages for interference with the sale of timber. McGill denied the allegations of the cross bill and after several amendments the cause came on for trial.
The demurrer was overruled and the cause was heard on the rescission issue. There was a conflict in the testimony concerning the representations of Hamilton to McGill about flooding of the lowlands prior to the sale, all of which occurred in the presence of witnesses. McGill testified that Hamilton, when asked, assured him the property did not flood, overflow, or have any flooding problems. According to McGill, Hamilton stated that he had been raised on the place and knew the bottom never overflowed. There was testimony that Farris was present when the alleged misrepresentations were made, but remained silent. McGill testified he would not have purchased the Sontheimer Place for cattle farming had he known it was subject to overflow and that Hamilton never represented to him that it flooded or "flashflooded." The appellants established on cross-examination, however, that McGill purchased the Johnson Place, also traversed by Harland's Creek, which lay immediately north of the Sontheimer land five days after the flood. This purchase was explained by McGill as the consummation of an agreement made prior to the flood.
In presenting their version of the events preceding the purchase, Hamilton testified that he advised McGill the Sontheimer Place was subject to flash flood and both he and Farris testified that on Tuesday, September 24, 1975, a few days prior to the purchase, while they were present on the land proposed to be purchased, that Hamilton advised McGill the creek did get out on the bottomland, and that he, the witness, would not have the place if it did not overflow. Both vendors admitted they knew the bottomlands of the Sontheimer Place had flooded in February or March 1973 while they owned it and Hamilton further admitted that he knew the creek overflowed when he purchased it. There was testimony that the Johnson Place, purchased after the flood, was also subject to overflow from the creek.
In rebuttal, McGill presented evidence, corroborated by telephone bills, etc., that he was in Houston, Texas, on Tuesday, September 24, 1975, and was not present in Holmes County, Mississippi, on that date. Faced with this evidence the defendants moved for a recess to secure witnesses on this new issue. The motion was overruled, however, and the case was taken under advisement upon adjournment of the court.
Later, the appellants moved to reopen the case so that testimony might be presented on the issue brought out on rebuttal. This motion was sustained and in addition, the court advised the litigants that testimony relating to an abatement of purchase price in the event the court denied rescission would be heard. When the hearing concluded, the case was again taken under advisement and thereafter, a decree was entered denying rescission but awarding an abatement of $53,400 on the purchase price, plus interest of $4,395.48. The court was of the opinion from the evidence that $53,400 was the difference in the value of the Sontheimer Place as represented to McGill at the time of purchase, September 27, 1974, and its actual value at that time. The court permitted this sum to be offset against McGill's note to Hamilton and Farris, and finally, the cross bill of the appellants was dismissed.
The trial court found that Hamilton and Farris had deceived McGill by their misrepresentations and silence that the bottomlands of the Sontheimer Place did not flood. It, however, denied rescission on several grounds, one being that the Sontheimer Place was suitable for cattle operations despite periodic flooding. It found that McGill had not offered to restore possession of the land nor to account for profits or pay fair rental for its use and had failed to plead or prove the present owner of the *828 promissory note and deed of trust, and, more importantly, that McGill's actions subsequent to the flooding so complicated the task of adjusting equities as to make rescission impractical.
The last premise was based upon the finding that McGill had continued to make capital improvements, plant crops, fertilize, and use farm equipment and sell cattle, originally purchased from the defendants, without tender to the defendants or maintenance of proper records. Thus, the court concluded that he was not in position to restore the defendants to status quo, or an approximation thereof, for rescission and that an abatement of the purchase price would be more equitable under the circumstances.
Although there are numerous assignments of error, the appellants argue only three. They are:
1. The court should have sustained the general demurrer and the motion to exclude appellee's evidence.
2. The court erred in permitting the appellee on reopening the case to introduce evidence on the issue of abating the purchase price.
3. The court was manifestly wrong in finding that appellants committed fraud and in entering a money decree.
McGill's assignment of error on cross-appeal is that the court erred in denying rescission.
The appellants first argue the opinion of the trial court implicitly acknowledges the general demurrer should have been sustained because the court found that McGill could not restore the defendants to status quo due to his activities on the Sontheimer Place after its purchase nor in his pleadings did he offer to restore the land to the defendants. From this it is urged that essentials to rescission, restoration or offer thereof, are lacking and it necessarily follows that McGill did not state a cause of action.
This contention is a projection of Griffith, Mississippi Chancery Practice, section 208, footnote 62a (2d Ed. 1950), which states in part:
... Before a party may rescind a contract of mutual and dependent covenants he must do or offer to do all required of him by it, and so show by his bill and proof... .
The argument requires a review of the cases supporting the statement. Hines v. Baine, S. & M. Ch. 530 (Miss. 1842), was a suit for specific performance of a contract to purchase "lots" in the city of Grenada. Its basis was "mutual and dependent covenants" where neither party had performed the requisite obligations of the agreement. The Court held there was nothing to indicate either an offer to convey title or a demand for payment or any notice of the intention of the vendor to abandon or rescind the contract, stating:
... Although a contract may be rescinded by one party by acts in pais, yet, where such is his intention, he must give notice of it, and must put the other party in default by offering to comply fully with his part of the contract ... and before Bryant could absolve himself from the contract, he was bound to have tendered a deed, or at least offered to convey upon the purchase-money being paid.... (S. & M. at 537)
The present case is distinguishable in that it does not involve "mutual and dependent covenants" to be performed, but rather is a consummated transaction where McGill had paid $59,000 for the land, had executed a note and deed of trust for the balance of the purchase price, had executed a timber deed and had paid approximately $15,000 to retire a note of the appellants as part of the consideration for the personalty bought from the appellants. Moreover, McGill's notice of rescission was evidenced by filing this suit within thirteen days after the flood. Hines, supra, though supporting the statement from Griffith, is distinguished, both by its facts and its pronouncements, from the present difficulty and is not controlling.
An examination of Hope v. Evans, S. & M. Ch. 195 (Miss. 1843), reveals it to be a suit for rescission based upon an illegal *829 contract upon which the complainant had made large and voluntary payments. The Court there held that the complainant was a particeps criminis and that:
... [I]t is a well settled principle, that a court of equity will never decree a partial rescission of a contract; and especially where, as in this case, the complainant insists that the contract is entire, and incapable of apportionment, and that the illegality, upon which the rescission is asked, goes to the whole consideration of the contract. (S. & M. Ch. at 205)
Again, we conclude the case probably buttresses the statement from Griffith, but it is nevertheless different in fact and in the law it pronounces from the present controversy and has no value as precedent to the issue before us.
In McGill's bill for rescission he did not in exact and precise terms tender a return of the lands. He nevertheless, after his allegation of facts, charged fraud and prayed for cancellation of the entire transaction including nullification of all instruments forming a part of it, and for a refund of the purchase and improvement monies expended by him. In our opinion this was a sufficient tender to meet the status quo requirements even though it was not expressed in apt terms, for surely it could not be contended that McGill, while requesting a cancellation of the very instruments vesting title in him and a lien upon the land to protect his interest in the event of sale, intended to retain title and possession. We conclude the complainant's suit should not be forfeited because a tender of status quo was not phrased in exact language when its meaning otherwise appears clear. The bill charged fraud and prayed for a rescission of a business transaction of some magnitude, carrying with it the distinct probability, in equity, of the complainant being entitled to some relief even if rescission were denied.
In Brown v. Norman, 65 Miss. 369, 4 So. 293 (1888), a rescission suit, this Court noted there are exceptions to the status quo requirements. The Court observed that oftentimes exact restoration could not be accomplished because the property was of less value or was more valuable due to improvements so that a literal status quo could not be met at time of suit, and since this was so, equity would not require a vain thing to be alleged when on final hearing the complainant could be required to do equity. It held that when parties to a suit cannot be restored to status quo, they are not precluded from relief against fraud, but the court may proceed to restore them to status quo as nearly as possible and make compensation for the difference. The Court ultimately held it was immaterial that status quo could not be literally restored.
Moreover, in McMahon v. McMahon, 243 Miss. 89, 137 So.2d 520 (1962), this Court gave application to that which is stated in Griffith, Mississippi Chancery Practice, as follows:
... "In accordance with the trend of modern judicial opinion it has been definitely established as a rule by our latest cases that attempt should not be made to settle close and difficult questions of law and right on a demurrer. If the demurrer raise merely a doubtful question or if the case be such that the cause of justice will probably be promoted by a determination of the ultimate right only on answer and proof, the court ought to exercise a fair judicial discretion to that end, although it may be that in technical point the grounds of the demurrer are sustainable in strict law." . .
(243 Miss. at 97-98, 137 So.2d at 523-524)
And further:
The rule is that if there be sufficient equity on the face of the bill to require an investigation of the facts, in other words if the bill has some merit, and considered as a whole it shows a good cause of action, it will stand as against a general demurrer....
(243 Miss. at 99, 137 So.2d at 524)
We conclude from these authorities the appellants' first assignment of error is without merit.
Appellants next contend the lower court should not have reopened the case for evidence on the issue of damages. They urge *830 the appellee selected his theory for suit, rescission, and could not later proceed on a different theory such as abatement of purchase price.
We note, however, the appellants were the parties who moved the court to reopen so that additional testimony concerning the meeting of Tuesday, September 24, could be offered to clarify the rebuttal testimony of the complainant. It was at this time that the court on its own motion directed that evidence on damages would be heard. The court stated:
Lastly, the court desires to take advantage in this opinion of raising an additional point. With most of the testimony now being in it appears that the could (sic) could conceivably find that the defendants procured the sale in question through fraud or misrepresentation but that the court should deny rescission. In such event, the court under the complainant's prayer for general relief could again conceivably find that the complainant is entitled to some compensation or an abatement of the purchase price ... At the present time there is no testimony in this regard before the court upon which a decision could be reached. If the trial is to be concluded at the next term, and it should be, both sides should be prepared to present such additional proof as may be necessary for the court to fairly resolve the matter of damages or compensation should the court ultimately find the complainant entitled to the same....
Abatement of purchase price, at times, is considered an appropriate remedy where rescission is denied, and this form of damages has rested upon the prayer for general relief. This Court addressed the office of a prayer for general relief in Milam v. Paxton, 160 Miss. 562, 134 So. 171 (1931), stating that it is to enable the court to grant relief that is warranted if the complainant has mistaken his special relief or to grant appropriate relief if the specific relief cannot be had. There the vendee brought a suit for specific performance of an oral contract for the sale of land. This relief was denied and, although the bill did not specifically pray for return of the purchase money, it did contain a prayer for general relief and the court ordered a return of the purchase money. It stated:
... [U]nder the general prayer any relief will be granted which the established main facts of the bill justify, provided that the relief so granted be such, fairly considered, as will not operate to the surprise or prejudice of the defendant, reasonable alertness having been exercised on his part... .
(160 Miss. at 570, 134 So. at 173)
We are of the opinion that rescission was not equitable under the present facts and that abatement in the purchase price was appropriate under the general prayer of the bill. We think abatement did not prejudice the parties since the trial court put all on notice of its intention to reopen for proof of damages on August 7, 1975, almost six weeks before the hearing was conducted.
Having decided the form of relief was appropriate, we next consider whether the chancery court had the power to reopen the case. It is well established that a chancery court has the authority to reopen a case for additional proof. In President of the Planters' Bank of the State of Mississippi v. Courtney, S. & M. Ch. 40 (Miss. 1843), the case was remanded to the docket for further proof and it was declared that a similar discretion had been exercised by the English Chancellors where some point in the case was left unproved or not sufficiently explained.
In Griffith, Mississippi Chancery Practice, section 595, pages 631-632 (2d Ed. 1950), it is said:
... [I]t has long been the settled rule in our courts of equity that where on a final hearing or even after submission it is clearly perceived that some material point is either left unproved or the explanation of it is insufficient the chancellor has a discretion in the interest of justice and merits to remand it to the docket for further proof... .
*831 See Cotten v. Cotten, 203 Miss. 316, 35 So.2d 61 (1948). We recognize that a remand for evidence on the primary theory of a suit differs from a remand for evidence on a different theory from that expressed in the bill of complaint. However, we are of the opinion where the parties were apprised of the theory, as here, in ample time to meet the issue, they cannot complain of any prejudice therefrom. We, therefore, are of the opinion that the appellants' second assignment of error is without merit.
Appellants' final argument is that the trial court was manifestly wrong in finding that fraud was committed and in entering a money decree. It is, of course, our rule that fraud is never presumed and must be proved with clear and convincing evidence. In McMahon v. McMahon, 247 Miss. 822, 157 So.2d 494 (1963), this Court stated that to establish fraud, one must show (1) the falsity of the representation, (2) the materiality of the false representation, (3) the speaker's intent that it be acted upon by others in the anticipated manner, (4) the hearer's ignorance of its falsity and reliance on its truth, (5) the hearer's right to rely thereon, and (6) the hearer's consequent and proximate injury. The record discloses ample evidence to establish that the statements of Hamilton were false and material to the transaction and influenced McGill in his purchase. Hamilton's statements were in positive terms as from his own knowledge.
On McGill's visits to the Sontheimer Place prior to purchase there was testimony from him, as well as others, that there was no evidence of previous flooding, such as debris, water marks or sand deposits to convey knowledge to him that it was subject to overflow. Moreover, his repeated questions concerning flooding problems is indicative of his reliance on Hamilton's statements in making the purchase. Lastly, he did suffer pecuniary injury as the direct result of flooding on March 12, 1975. From this record we are of the opinion the chancellor correctly resolved the evidence and certainly we cannot say that he was manifestly wrong in his finding of fraud and the injury and damages resulting therefrom. McNair v. Capital Electric Power Ass'n., 324 So.2d 234 (Miss. 1975).
We are not persuaded by cross-appellant's contention that rescission of the contract whether complete or partial, was wrongfully denied. As we have mentioned, the transaction was an entirety although it was composed of more than one document. In Mariana v. Hennington, 229 Miss. 212, 90 So.2d 356 (1956), we held that a contract may in its nature and in its terms be severable and yet be considered an entirety by the intention of the parties. Presently, we cannot say this transaction by its facts or the intention of the parties was to be considered other than an entirety. From this we are of the opinion the trial court correctly upheld the established principle that a court of equity will not decree partial rescission where the contract is entire and incapable of equitable apportionment. Hope v. Evans, supra. Moreover, there was no effective means to rescind the transaction between the parties upon a fair basis. Proper records on the personalty sold or retained had not been maintained and numerous improvements on the land, including renovation of the residence, had been made so that a return to status quo would likely result in inequity rather than fairness between the parties. Thus, we are of the opinion that denial of the rescission by the trial court, either in whole or in part, was proper. We therefore affirm the decree in its abatement of the purchase price.
The case was considered by all of the justices en banc.
AFFIRMED ON DIRECT AND CROSS-APPEALS.
INZER, P.J., and ROBERTSON, SUGG, BROOM and BOWLING, JJ., concur.
LEE, J., SMITH, P.J., and WALKER, J., dissent.
LEE, Justice, dissenting:
I respectfully dissent from that part of the majority opinion which affirms the chancellor's finding that fraud was committed *832 by appellants in the sale of the land and which affirms a money decree in appellee's favor. The alleged fraud is contained in testimony of appellee to the following effect: "Hamilton said it did not flood or overflow ... Hamilton ... said it did not flood and the creek would take care of any water."
T.E. Powell, a witness for appellee, farmed the Sontheimer Place at intervals since 1954 and has a farm adjoining same. He testified that the place was all right for a cattle operation, that there were flash floods, which might happen twice this year and skip four or five years, but, on an average, they occur every two or three years.
Innes Burkes has a farm adjoining the Sontheimer Place on the south side where he has lived since 1962, and he has worked the Sontheimer Place. He testified that after a hard flash rain, a big rain, Harland Creek will overflow some but the water does not stay long. He has seen water over the Sontheimer bottom twice since he has lived next to that place, and the overflow, which also affected his property, did not damage either properties. He stated that the place was all right for a cattle operation.
Herbert Downer was familiar with the Sontheimer Place, and he lived on a farm near it. He said that, after a big rain, the water would get out on the land some and go right back in the banks of the creek and that no damage resulted to the land.
Ralph Heck worked the Sontheimer Place in the years 1972, 1973 and 1974, and the place did not overflow during those years. He stated that it was as good as any average cattle farm and that he had never seen the pastures damaged by water.
Henry Brock farms over a thousand acres of land in Holmes County. He is familiar with the Sontheimer Place and rented it for three years. He is Chairman of the County ASC Committee and Commissioner of the Holmes County Soil and Water Conservation District. When the creek flashfloods, after a short while, the water is back within the banks of the creek. He said that the water did not damage the pasture land, and that the Sontheimer Place is suitable for a successful cattle operation.
Appellee discovered the Sontheimer Place was for sale after reading an advertisement in a Jackson newspaper. He contacted the realtor in charge of the sale, and then went to Holmes County, talked with him and appellants, and was taken over the property by appellant Hamilton. Appellee was accompanied by a friend (Charles Pigg) who was familiar with cattle farming and who advised him that it was a beautiful place for a cattle ranch. Appellee went over the entire property, including all the bottoms, he thoroughly inspected the creek and the lay of the land. He made no inquiry from adjoining landowners, from the ASC office, or any other source whether the place was satisfactory for a cattle operation, or about the water condition after rains. Appellee owned a cattle farm in Claiborne County, Mississippi, and he had five years' experience on cattle farms elsewhere.
The fraud question here actually goes to value of the land purchased, as indicated by abatement of the purchase price. In Deshatreaux v. Batson, 159 Miss. 236, 131 So. 346 (1930), which involved the sale of a store building and lot, stock of merchandise and personal property, and where some property values were represented by the seller to be worth much more than actual values, the Court said:
"The general rule is that a person has no right to rely on representations as to value; he is required to exercise his own judgment as to value. It is an act of folly on his part to accept the other person's statement in that respect. Such statements are usually mere expressions of opinion, or judgment, which will not excuse the other party's failure to make an examination for himself for the purpose of ascertaining the real facts. This is especially true where the relation of the parties are naturally antagonistic, such as buyer and seller. Where the means of information are equally accessible to both parties, expressions of opinion, however positive, by one of the parties, *833 cannot be considered as a fraud upon the rights of the other." 159 Miss. at 243-244, 131 So. at 348.
See also Hunt v. Sherrill, 195 Miss. 688, 15 So.2d 426 (1943).
Accepting the findings of the chancellor that appellant Hamilton stated the Sontheimer Place did not flood or overflow and that the creek could take care of the water, I do not think that such a statement is clear and convincing proof of fraud on the part of Hamilton. The evidence does not indicate what the parties meant by "flood or overflow." A flood or overflow in the Mississippi Delta and along tributaries of the Mississippi River certainly have different meanings than a flash flood or overflow along Harland Creek in Holmes County. It is common knowledge that practically all branches and creeks in the hill country of Mississippi will flow out of their banks after a rain of heavy proportions and extended duration, but when the rain stops and a short while elapses, the water will recede into the banks of the streams. Such flash floods are vastly different from overflows and floods that remain outside the banks of a river for days and weeks. I have no quarrel with the principle stated in McMahon v. McMahon, 247 Miss. 822, 157 So.2d 494 (1963), cited in the majority opinion, but I believe that the chancellor was manifestly wrong in holding that the principle applies to the facts in this case.
I do not think that appellee should be permitted to avoid his solemn written obligations by claiming fraud, particularly where he is an intelligent, experienced businessman and cattleman, he viewed every part and parcel of the property before he bought it, and he had every opportunity to make an independent investigation of any question he may have had concerning same. Likewise, I think he had a responsibility and duty in the matter. Therefore, I must dissent from the majority opinion.
SMITH, P.J., and WALKER, J., join in this dissent.