# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-00625-SCT

*BILLY R. BROWDER AND PEGGY BROWDER*

*v.*

*EDDIE E. WILLIAMS AND SARAH A. WILLIAMS*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/02/1998 |
| TRIAL JUDGE: | HON. THOMAS L. ZEBERT |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | DERRYL WAYNE PEDEN |
| ATTORNEY FOR APPELLEES: | JOHN H. EMFINGER |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | REVERSED AND REMANDED - 08/31/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/21/2000 |

**BEFORE PITTMAN, P.J., McRAE AND MILLS, JJ.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This is a case concerning the breach of a contract for the purchase of a house. The plaintiffs purchased a house from the defendants, who knew that it had a defective septic system. After hearing expert testimony from both parties, the chancellor ruled for the plaintiffs and awarded the plaintiffs $3,375 for replacement of the system and $2,000 in attorney's fees. This Court finds that the chancellor committed manifest error in that his award of damages was wholly inadequate and clearly based on a misapprehension of the facts. In addition, the chancellor failed to make findings of fact and conclusion of law concerning the factors which are to be considered in determining reasonable attorney's fees. Accordingly, this case is reversed and remanded.

## STATEMENT OF THE CASE

¶2. On October 31, 1996, Billy R. Browder and Peggy Browder (the "Browders") purchased a home from Eddie E. Williams and Sarah A. Williams (the "Williamses") at 167 Williams Drive in Rankin County for $87,500. Shortly after moving into the home the Browders discovered that the property had severe problems with its septic system. After several attempts to get the Williamses to correct this problem, the Browders filed suit against the Williamses on July 27, 1997, for breach of contract, negligence, gross negligence, misrepresentation, and fraud. The Browders specifically alleged that the home which they purchased from the Williamses had a "non-functional and illegal" septic tank which dumped raw sewage onto neighboring property. The chancellor ruled in favor of the Browders and found that the Williamses knew the septic system was defective, failed to disclose that information to the Browders, and had committed fraud and breached the purchase contract as well as their warranty of habitability and their

implied warranty of marketability. The chancellor awarded the Browders $3,375 for repair or replacement of the septic system and $2,000 in attorney's fees. The Browders then filed a motion for reconsideration of the chancellor's award due to the inadequacy of awarded damages. The chancellor denied the motion.

¶3. The Browders presented considerable evidence which clearly demonstrated that the chancellor's damage award was inadequate and based on a misapprehension of the facts and, therefore, was not supported by substantial evidence. Further, the chancellor should not have made a blanket award of attorney's fees. He should have performed a detailed analysis supported by factual findings to determine the proper amount of attorney's fees.

## FACTS

¶4. The home purchased by the Browders had been built by the Williamses approximately 20 years ago. On July 2, 1997, some nine months after the purchase, Mr. Browder wrote to Mr. Williams explaining that the sewage system was illegally draining onto adjacent property. After the Williamses failed to correct the problem, the Browders filed suit in the Chancery Court of Rankin County, on July 27, 1997, alleging that the house had a non-functional and illegal septic tank. In an unusually detailed "Findings of Fact and Conclusion of Law," the chancellor held that the defendants knew the septic tank was illegal when the house was sold and had failed to disclose this to the plaintiffs. He awarded plaintiffs $3,375 for repair of the septic system and $2,000 in attorney's fees. The plaintiffs appealed on the grounds that the judgment was inadequate.

¶5. Joseph Loftin, the owner of property adjacent to 167 Williams Drive, noticed that whenever it rained an odor emanated from raw sewage that drained from a white pipe directly into a ditch located on a railroad right-of-way. He asked Mrs. Williams if the pipe originated at her house, and she assured him that none of their sewage lines left their property. Shortly before the Browders moved into the house at 167 Williams Drive, the pipe disappeared.

¶6. Before selling the property, Mrs. Williams had Denise Walker, an environmentalist with the State Department of Health, inspect the sewage system. Walker spotted the white pipe, and Mrs. Williams told her that it drained rainwater. After the Browders purchased the property, the Browders asked Walker to inspect the property again because the wastewater system was surfacing. At that time, the ground was not saturated, and she saw no problem with the white pipe. On her next visit, the white pipe had been removed, and sewage was emanating from a black pipe. (The white pipe had previously been attached to the black pipe). Testing revealed that the sewage system on the Browder property was not recommended for that type land. The system could be repaired, however, with a sub-irrigation drip which would not filter the wastewater, rather it would deposit it underground. A sub-irrigation system could have been installed starting at about $7,500.

¶7. Mrs. Williams testified that she and her husband built the house twenty years ago, acting as their own general contractors. When the Browders were contemplating purchasing the property, they came out about five times. Mr. Browder asked whether the septic tank worked properly, and Mrs. Williams told him that it did. Mrs. Williams testified that she was unaware, until informed by the Browders, that there was any problem with the sewage system. After the Browders moved in, they insisted that the Williamses' seller's insurance should pay for a new roof (the existing roof was seven years old). In February 1997, Mrs. Williams gave them the checks from State Farm to pay for a new roof.

¶8. An environmental health program specialist for the State Department of Health, Eugene Herring, evaluated the Browders' septic system. Herring recommended two options: replacing the system with a subsurface drip disposal or, if they could obtain additional space or an easement, a spray field. The cost to install a drip disposal system, the parties stipulated, would be $19,500 plus sales tax. Herring testified that he knows of only one other subsurface drip system in Rankin County because the systems are expensive and the first generation of subsurface drips that were marketed malfunctioned.

¶9. When Peggy Browder inspected the house prior to buying it, she asked to be shown where the sewer lines were located. Mrs. Browder was familiar with septic systems and was aware that a septic system made parts of the property unusable for a vegetable garden. Mrs. Williams pointed out the septic tank and assured her that all of the sewer lines were behind the house. She did state, however, that sometimes the drains were a little slow and she gave Mrs. Browder a container of Liquid Fire and a container of Roto Rooter to use when that happened. The seller's disclosure statement made no mention of the fact that a discharge pipe ran off the property. The real estate contract also indicated that the plumbing system was in good working order. The Browders purchased the house on October 31, 1996. The Browders were waiting for their son to finish his fall semester of school and did not move in until January 1997. Within a week of moving in, Mrs. Browder noticed that water was backing up into the house and that there was sewage in the bathtub. February 1997 was the first time she learned that the field line was draining onto adjacent property.

¶10. Mrs. Browder testified that she no longer wanted the house since the land around the house would be unusable for anything but grass. She claimed the problems with the house had ruined her marriage and their lives.

¶11. The chancellor found that the Williamses were guilty of fraud in that they were aware of the sewage problem when they sold the house. He awarded damages of $3,375, which was an amount equal to one-half the difference between an estimate of $7,500, provided by Denise Walker, and another of $850, the amount to dig up the line. He awarded $2,000 in attorney's fees.

### DISCUSSION

### Standard of Review

¶12. This Court will not disturb the factual findings of a chancellor unless the chancellor was manifestly wrong or clearly erroneous, or if an erroneous legal standard was applied. *Pearson v. Pearson*, 761 So.2d 157, 162 (Miss. 2000). Whenever there is substantial evidence in the record to support the chancellor's findings of fact, those findings must be affirmed. *Monticello Ins. Co. v. Mooney*, 733 So.2d 802, 805 (Miss. 1999); *Johnson v. Hinds County*, 524 So.2d 947, 956 (Miss.1988). Questions of law are reviewed de novo. *Holliman v. Charles L. Cherry & Assocs. Inc.*, 569 So.2d 1139, 1145 (Miss. 1990).

### I. THE CHANCELLOR ERRED IN FAILING TO AWARD RESCISSION AND CONSEQUENTIAL DAMAGES TO THE PLAINTIFFS.

¶13. Although the chancellor found that the Browders had proven that the Williamses were guilty of fraud, [1] the chancellor, in his otherwise detailed findings, did not address the issue of rescission. On the issue of damages, the chancellor wrote, "[t]his Court finds that the elements of fraud have been met and that the

recovery should be for a replacement or repair of the system."

¶14. The Browders argued that, as the defrauded party, they have the option of choosing to pursue a remedy in contract law of sales or bring an action in tort for fraud and deceit. ***Bryan Constr. Co. v. Thad Ryan Cadillac, Inc.***, 300 So.2d 444, 448-49 (Miss. 1974).

¶15. The Williamses argue that rescission was not an available remedy because the plaintiffs never "tendered" the real property to the Williamses.

¶16. Rescission is an appropriate remedy for fraud. ***Ezell v. Robbins***, 533 So.2d 457, 461 (Miss. 1988); ***Turner v. Wakefield***, 481 So.2d 846, 848-49 (Miss.1985); 8A Thompson on Real Property § 4465, at 366-67 (1963) (courts may rescind contracts for sale of real property on the basis of fraud, misrepresentation or mistake). Since neither party contests the chancellor's finding of fraud, it is clear that the chancellor would not have erred had he rescinded the contract. Thus, the real question here is whether the finding of fraud requires rescission.

¶17. According to a leading treatise,

> One induced to purchase land for fraudulent misrepresentation may either bring an action for the fraud or for breach of covenants of his deed. He has an election.
>
> * *
>
> He may either affirm the contract, and sue for damages, or disaffirm it and be reinstated in the position in which he was before it was consummated.

8A Thompson on Real Property § 4468, at 387-88 (1963).

*¶18.* This Court said much the same thing in ***Laurel Auto Supply Co. v. Sumrall***, 184 Miss. 88, 185 So. 566 (1939). We held that a buyer who has been deceived by material false representations in the procurement of a contract may elect to rescind and to be restored to the position he occupied at the time of sale.[(2)]

¶19. There is authority, however, to the effect that rescission is not required. In ***Hamilton v. McGill***, 352 So.2d 825 (Miss. 1977), the buyer sued to rescind a contract to purchase land and timber after the land flooded. The chancellor found that there was fraud but did not rescind the contract; the buyer was awarded monetary damages instead. On appeal, this Court affirmed, stating as follows:

> In ***Brown v. Norman***, 65 Miss. 369, 4 So. 293 (1888), a rescission suit, this Court noted there are exceptions to the status quo requirements. The Court observed that oftentimes exact restoration could not be accomplished because the property was of less value or was more valuable due to improvements so that a literal status quo could not be met at time of suit, and since this was so, equity would not require a vain thing to be alleged when on final hearing the complainant could be required to do equity. It held that when parties to a suit cannot be restored to status quo, they are not precluded from relief against fraud, but the court may proceed to restore them to status quo as nearly as possible and make compensation for the difference. The Court ultimately held it was immaterial that status quo could not be literally restored.

*Hamilton*, 352 So.2d at 829.

¶20. The buyer in *Hamilton* had made improvements on the land since the sale. He also sold some of the cattle which comprised part of the purchase. Finding it impossible to restore the parties to their status quo prior to the sale, this Court held that the chancellor did not err in giving the buyer a refund on the purchase price in lieu of rescission.

¶21. The Williamses argue that rescission is improper because there was no tender by the Browders. This brings up the question of how is real property tendered. In *Hamilton*, this Court held that the complaint, filed thirteen days after the land flooded, was sufficient to put the seller on notice that he desired to rescind the contract. *See also* ***Grant v. Wrona***, 662 S.W.2d 227, 230 (Ky. Ct. App. 1983) (complaint acted as tender; one seeking rescission is not required to abandon the property during the pendency of the legal dispute). In this case, the Browders filed suit some five months after first learning that the sewage line emptied onto adjacent property.

¶22. This Court held that an offer to return the goods was necessary, but where the goods have been delivered to the buyer, the buyer does not have a duty to return the goods. ***Davis v. Ross***, 208 Miss. 441, 448, 44 So.2d 534, 536 (1950).

¶23. Although the chancellor did not address the issue of rescission in his opinion, as the cases above demonstrate, he certainly was not required to order rescission where monetary damages would suffice.

## II. THE CHANCELLOR ERRED BY AWARDING MONETARY DAMAGES AND ATTORNEY'S FEES IN GROSSLY INADEQUATE AMOUNTS WHICH WERE NOT SUPPORTED BY THE EVIDENCE.

¶24. The chancellor's decision on damages stated as follows:

Ms. Denise Walker, State Department of Health, stated that probably a subrogation drill would be the best procedure and that it would cost $7,500.00 and an additional estimate was $19,500.00. There was another estimate to repair the existing system for approximately $840 as stated by Ms. Denise Walker. The Court is left in a quandry (sic) with two diverse amounts but is of the opinion that the real figure to repair the problem is somewhere between $850.00 and $7,500.00 and therefore assesses the cost to the Williams in the amount of $3,375.00 or one-half of the difference and is based on the ***Wall v. Swilley***, 562 So.2d 1252 (Miss. 1990).

One measure of damages generally fitting these premises we know as the "benefit-of-the-bargain" rule. Under this rule, a purchaser, victim of a seller's material misrepresentation, may recover the difference between the real value of the property and the represented value of the property, the date of sale/discovery being the touchstone. This rule gives to the purchaser the value he would have received had the seller performed the bargain and had the facts been as the seller represented them. *Id*. at 1256.

Under the benefit of the bargain rule, an alternative measure of recovery is the reasonable cost of placing the property received in the condition in which it was represented to be.... *Id.* at 1257.

The benefit of the bargain rule prevents an aggrieved party from obtaining more by way of Judgment than they would have received had no defect existed in the property sold.

¶25. The Browders contend that the evidence demonstrated that the only way to fix the problem was to replace the system with a subsurface drip system, which the parties stipulated would cost $17,500. The $850 estimate was for removal of the illegal line only. The removal of the illegal relief line would only decrease the drainage capacity of the existing inadequate septic tank system. Additionally, the Browders argue that the award of attorney's fees was inadequate as it was only half the amount requested.

¶26. The Williamses argue that the chancellor found that there was fraud only with regard to the overflow pipe trespassing upon the adjoining property so that it discharged sewage onto the property of others. The chancellor awarded $3,375, which was a much greater amount than was necessary to repair the system.

¶27. This Court recognizes three different measures of recovery[3] where rescission is not sought: benefit of the bargain, reasonable cost of repair, or out-of-pocket recovery. *Wall v. Swilley*, 562 So.2d 1252 1256-57 (Miss. 1990). The benefit of the bargain measure of damages would give the buyer the difference between the value of the property as it was represented to be and the value of what was actually received.

¶28. For instance, in *Hunt v. Sherrill*, 195 Miss. 688, 15 So.2d 426 (1943), the plaintiff purchased a hotel for $75,000. After taking possession of the property, she bought suit alleging that the seller had misrepresented the condition of fixtures, etc. Assuming the value of the hotel in the condition in which it was sold was $60,000 and that the hotel was worth $80,000 if it were in the condition it was represented to be, under the benefit of the bargain rule, plaintiff would receive $20,000 as her damages. Under the out-of-pocket rule, she would get the difference between what she actually paid and what the hotel was worth or $15,000. *Id.* at 699, 15 So.2d at 429. Where there is no evidence as to the value of the property as it was represented to be, it is assumed that the amount paid for the property is the represented value. *Id.* at 700, 15 So.2d at 429.

¶29. In *Davidson v. Rogers*, 431 So.2d 483 (Miss. 1983), the buyer contended that the seller misrepresented the rear boundary line of the property as well as the condition of the foundation. The purchase price of the house was $41,799.62 and the real value of the house was $23,500. The buyer was entitled to damages of $18,299.62.

¶30. In this case, there was no testimony establishing the real value of the house at the time it was sold. The Browders were relying on reasonable cost of repair damages or recission.

¶31. The chancellor awarded damages as the difference between what he thought were two estimates for reasonable cost of repair - $850 and $7,500. There are two problems with his calculations. First of all, in this case the difference between the $850 and $7,500 yields a figure that is not close to $850. It seems a fairer estimate of the reasonable cost would be the midway point between $850 and $7,500, which is $4,175. The second and larger problem with the chancellor's finding is that the $850 represents only the cost of digging up the illegal line, and there was no evidence, testimony or otherwise, that this alone would cure the problem.[4] Moreover, the chancellor erred when he credited the $850 figure to Denise Walker, the environmentalist with the State Department of Health. Walker never testified that repairs could be done for $850. The $850 figure was an estimate prepared by Norsworthy Tank to dig up and cap the line. It was introduced during the testimony of Eddie Williams. The Williamses' lawyer explained that the estimate was "To take out this second line which is draining into the ditch and leave the remaining field lines."

¶32. The chancellor's award, then, is not supported by substantial evidence but rather on the chancellor's mistaken view of the evidence. The only figures with respect to fixing the sewage system were those of $7,

500 (per Denise Walker) and $19,500 (per Eugene Herring). Given the evidence, the award of $3,375 was less than half of the lowest estimate and, thus, is unsupported by the evidence.

¶33. The Browders' attorney submitted an itemized fee application specifying 443 hours at $100 an hour for a total of $4,430. The chancellor awarded $2,000 in attorney's fees in the last paragraph of his "Findings of Fact and Conclusions of Law," but did not specify his reasons for awarding the Browders less than half the amount requested.

¶34. The fixing of reasonable attorney's fees is a matter ordinarily within the sound discretion of the trial court. *Mauck v. Columbus Hotel Co.*, 741 So.2d 259, 269 (Miss. 1999); *Mississippi Dep't of Wildlife, Fisheries & Parks v. Mississippi Wildlife Enforcement Officers' Ass'n, Inc.*, 740 So.2d 925, 937 (Miss. 1999); *Deer Creek Constr. Co. v. Peterson*, 412 So.2d 1169, 1173 (Miss.1982). This Court does not, however, leave the reasonableness of an award for attorney's fees to the arbitrary discretion of the trial court. *Par Indus., Inc. v. Target Container Co.*, 708 So.2d 44, 54 (Miss. 1998). The award should be supported by the evidence and should not "be plucked out of the air." *Dynasteel Corp. v. Aztec Indus., Inc.*, 611 So.2d 977, 987 (Miss. 1992).

¶35. The reasonableness of an attorney's fee award is determined by reference to the factors set forth in Rule 1.5 of the Mississippi Rules of Professional Conduct. This Rule provides in pertinent part:

(a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

Miss. Rules of Professional Conduct 1.5. *See also Dynasteel Corp.*, 611 So.2d at 986-87; *Carter v. Clegg*, 557 So.2d 1187, 1192 (Miss.1990). These are sometimes referred to as the *McKee* factors. *See McKee v. McKee*, 418 So.2d 764, 767 (Miss. 1982). The chancellor should have applied these factors in determining the amount of attorney's fees to be awarded and supported that award with factual determinations.

## CONCLUSION

¶36. The chancellor's damage award was based on a misapprehension of the facts and, thus, was not supported by substantial evidence. The chancellor on remand is to consider reasonable compensation or recission. The chancellor further failed to consider the *McKee* factors in making the award of attorney's fees. On remand, the chancellor shall reconsider this issue in light of those factors and make a new award based on findings of fact and conclusions of law concerning those factors. Accordingly, the judgment of the Rankin County Chancery Court is reversed, and this case is remanded to the chancery court for further proceedings consistent with this opinion.

¶37. **REVERSED AND REMANDED.**

> **PRATHER, C.J., PITTMAN AND BANKS, P.JJ., MILLS, COBB AND DIAZ, JJ., CONCUR. WALLER, J., CONCURS IN RESULTS ONLY. SMITH, J., NOT PARTICIPATING.**

1. This issue was not raised by either party on appeal.

2. The purchaser would be required to pay a reasonable rental value while in possession.

3. *Hunt v. Sherrill*, 195 Miss. 688, 699, 15 So.2d 426, 429 (1943), mentions a fourth measure of damages: "the flexible or equitable rule, which adopts one or the other of the two foregoing rules as is best adapted to the particular case."

4. Based on Mrs. Browder's testimony, it seems that the existing lines were insufficient to handle the needs of three people. She testified that she and her son joined her husband in the house in January 1997, and within a week she noticed the drains were slow.