MARIANI, et al. *v.* HENNINGTON, et al.

No. 40251       November 12, 1956       90 So. 2d 356

*R. H. & J. H. Thompson,* Jackson, for appellants.

*Armstrong & Hoffman; Henley, Jones & Woodliff,* Hazlehurst, for appellees.

ROBERDS, P. J.

This litigation grows out of two contracts, both dated February 16, 1951. Liability rests upon compliance or

noncompliance with the terms of said contracts, and in case of noncompliance, whether such breach was waived by the other party.

One of the contracts was executed between World Wide Manufacturing, Inc., a New York corporation with its principal office at Ridgefield, New Jersey, which hereinafter we will call World Wide, and W. H. Russum and B. M. Hennington, a partnership, doing business under the name of Dixie Shook & Box Company located at Crystal Springs, Mississippi, whom we will hereinafter call complainants, and Frank Mariani, a resident of New York City, New York, who, when the contracts were executed, was president and owner of a majority of the stock of World Wide. Hereinafter we will refer to Mr. Mariani by use of his surname.

A short reference to the background of the contracts may be of aid in understanding and solving the problems involved in this litigation.

On and prior to January 17, 1951, Eisen Metal Products Company of Lodi, New Jersey, was a party to a prime contract with the United States, under which Eisen was to manufacture for the Federal Government a quantity of wooden containers, or boxes, suitable for transportation of ammunition. Eisen entered into a subcontract with World Wide under which World Wide was to prepare and furnish the materials for these boxes, and, as to certain types, assemble the furnished parts into the completed boxes. On January 17, 1951, Eisen sent to World Wide a purchase order for some 48,000 wooden packing boxes, agreeing to pay a stipulated price per unit therefor. This order stated the work was to be done according to Government print and specifications and shipments were to be made as per schedule set out in the order, beginning with February and ending in December, 1951. The order required ''3 copies of certification that materials are in accordance with specifications''. The order specified that the contract with

World Wide was a subcontract under the Eisen prime contract with the Government, and that it was subject to some eight specified governmental regulations, such as the Eight Hour work day law, Federal nondiscrimination employee provisions, etc. We quote one provision: "Termination or modification of this contract on exercise by government of right of termination or modification under Government contract". The purchase order also recited "government inspection at source", and said the prices to be paid World Wide were for the life of the contract "subject, however, to a maximum increase of 10% to cover additional cost of seller's labor and material upon prior notification".

On March 27, 1951, Eisen mailed to World Wide another purchase order for 190,000 "wood spacers in accordance with our print No. 10-113 enclosed". These spacers were to be packed in cartons, and there were to be four spacers to each box and provided for "Government inspection at source". The order also specified "The above prices are for the life of this contract". It then recited the contract with World Wide was a subcontract, giving the Government number of the contract, and made it subject to the same six regulations and governmental requirements as to discrimination, eight hours work a day, and right of termination or modification by the Government, etc.

We now deal with the terms of the two contracts of February 16, 1951, which are of prime importance in this litigation.

The first contract was between complainants, World Wide and Mariani. It recited that Mariani was the holder of the majority of the stock in World Wide, and that World Wide was engaged in the manufacture of wooden boxes and containers; that complainants had the facilities for the manufacture of such boxes and containers and what is called in the contract "shook", and that complainants, by separate agreement with Mariani,

were acquiring additional facilities and machinery and equipment for the manufacture of such boxes and containers and the component parts thereof; that World Wide desired to engage the services and facilities of complainants, and complainants were desirous of procuring the business of World Wide. It was then agreed that World Wide would place all of its orders for ''shooks'' with complainants to the extent complainants could fulfill said orders at its plant, and complainants agreed to accept and fulfill the orders in preference to orders for others. However, if the requirements of World Wide should not be sufficient to utilize the full output of complainants' plant they were at liberty to accept outside orders, but the price to World Wide would not be in excess of the price made by complainants to other persons. It was then stipulated that simultaneously with the execution of this agreement World Wide would place with complainants, and complainants would accept, an order to ''make up'' shooks sufficient to make 48,000 ammunition boxes ''under the specifications outlined in the accompanying order, delivery as per schedule attached and prints previously exhibited, at a price of $2.12½ per box, f. o. b. Crystal Springs, Miss.'' We now quote paragraph 4 of the contract: ''The first party agrees to pay for all shooks and/or boxes purchased from the second party promptly upon being loaded fob railroad cars or trucks operated by a common carrier and agrees to honor all sight drafts drawn by the second parties on the first party through the Truckers Exchange Bank at Crystal Springs, Mississippi, or any other bank designated by the second parties, accompainied by invoices, straight railroad bill of lading and inspection certificate, by government inspector, whenever such commodity is required to be inspected by government inspector, and shall arrange with its bank or banks to furnish to the Truckers Exchange Bank of Crystal Springs, Mississippi, or other banks selected by

second parties, a written continuing guaranty that all such sight drafts will be paid immediately upon presentation in order to provide a manner in which the second parties may obtain payment on such orders promptly upon shipping the same. If for any reason no Government inspection is required or made at the plant of the second party, then the inspection certificate shall be that of an inspector designated by mutual consent of the parties, and the inspection report shall certify that the materials inspected comply with the specifications outlined in the particular contract under which the shipment is being made, and also certifying to the quantities involved in such shipment.''

In paragraph 5 of the contract World Wide agreed to send, at its own expense, Mr. Herbert Kott to Crystal Springs to install the machinery and equipment leased, as hereinafter shown, by Mariani to complainants. Mariani was granted an option, within one year, to purchase a one-fourth interest in the partnership of Russum and Hennington at Crystal Springs, on the basis of actual cash value of such interest. It was also agreed that if Mariani decided to sell the machinery and equipment before its installation at Crystal Springs complainants would be given the first right to purchase. Paragraph 8 required all of the work by complainants to ''be done in a first-class workman-like manner'', and it bound complainants to comply with all Federal, State and Municipal laws, rules and regulations ''pertaining to the manufacture and sale of the commodity either commercially or for defense orders'', and particular attention was called to notation of the eight laws and regulations set out in the Eisen-World Wide contract above mentioned. It was recited that while, for the near future, the parties contemplated fulfillment of defense orders for the Government, the hope was expressed that a long range plan might grow out of this relation of the parties which would enable them to serve the beverage trade of the

south. Paragraph 12 of the agreement conferred the right upon either party to the contract to terminate the contract upon 60 days written notice of the other by registered mail except that all unfinished contracts or orders of World Wide which had been previously accepted would be completed as contracted, "and all payments thereunder shall be made". Mariani expressly agreed to guarantee the full performance of this contract by World Wide, and complainants likewise guaranteed fulfillment on their part of all the terms and obligations assumed by complainants under the contract.

There was attached to, and made a part of this contract, a purchase order for 48,000 "Wooden Packing Box for Modification Kit M-34", to be completely assembled and set up, according to Government drawings and specifications, and requiring three copies of certification that the materials are in accordance with specifications, and containing the notation "government inspection at the source." It then set out the amounts and dates of deliveries, ranging from February to December, but in February only samples should be furnished. The purchase order then stipulated that it was a subcontract under the Eisen contract, giving the number of the Eisen-World Wide contract. The purchase order stipuated that the six rules and regulations and laws, a part of the Eisen contract, were also a part of this purchase order, and consequently a part of the first contract of February 16, 1951.

The other contract under date February 16, 1951, was between complainants, a partnership, doing business at Crystal Springs, Miss., and Mariani. It recited that Mariani owned and controlled certain machinery and equipment located at Glendale, New York, which had been inspected by complainants, and which they, complainants, intended to transport to Crystal Springs and there install on certain premises. The parties then agreed that Mariani, at his own expense, would dismantle

the machinery and load it on freight cars, or other means of transportation, consigned to complainants at Crystal Springs. Complainants would pay the freight on such transportation and install the machinery and equipment at Crystal Springs, all at their expense. Mariani then agreed to lease to complainants said equipment and machinery for one year from date of installation, the lease price to be 1% of the fob price of all shook and/or boxes manufactured thereon for World Wide and 1½% of the price of shook and boxes manufactured on said machinery and equipment for parties other than World Wide. Complainants agreed to pay all taxes on said machinery and equipment during the existence of the lease or any extension thereof. Complainants agreed to take good care of the leased property. In case of default by complainants Mariani had the right to declare the contract at an end, in which case complainants agreed to properly dismantle the leased property and deliver it to a common carrier for transportation. The lease agreement could be extended, by mutual consent, for one year, and failure to give notice for 30 days of intention to terminate the same, would automatically extend it for one year. It was further provided that in case written notice of intention to terminate should be given as provided in the contract, the contract would end "except that all unfinished contracts or orders of World Wide previously accepted shall be completed as contracted, and all payments thereunder shall be made".

The bill herein, filed by Russum and Hennington as complainants, June 2, 1953, charged that World Wide and Mariani breached the first February 16th contract in three respects: They failed to furnish an inspector of the finished product at Crystal Springs, the point of production; they failed to furnish a guarantee of immediate payment at Crystal Springs of the loaded materials; and they finally refused to permit complainants to finish the contract.

Complainants asked for damages for the following reasons and in the following amounts:

Additional expense incident to the manufacture by complainants of shooks for 8640 boxes in the sum of $2,160.00, "in excess of what the cost for manufacturing said boxes would have been if said contract had been complied with".

The price and value of shook, spacers and assembled boxes, shipped October 31, 1951, invoice No. 13, for which World Wide refused to pay, $733.94.

Extra work, performed on the ordered materials, invoice 14, in the sum of $734.40

The value of additional lumber to tongue and groove and glue corrugated boxes, all of which was extra work on 8640 boxes, invoice 15, in the sum of $2,073.60.

Profits which would have been made on 39,360 boxes "if said contract had been performed", in the amount of $8,364.00.

Profits which would have been realized by complainants on the manufacture of 142,833 spacers, which World Wide would not permit them to manufacture. The total damage claimed by complainants was $15,494.27.

The bill further sought to attach the machinery and equipment of Mariani, delivered to complainants under the lease agreement above set forth and by complainants installed at Crystal Springs, and as general ground for the attachment asserted that Mariani was a nonresident of Mississippi and that said machinery and equipment were in the possession of Dixie Shook & Box Company, a corporation, which had been chartered under the laws of Mississippi in 1952, and to which complainants had conveyed all of the personal property leased by Mariani to complainants. It was asserted that Mariani was liable under the first February 16th contract for the defaults of World Wide, and that the leased property should be subjected to the payment of such guaranteed obligations as might be determined by the equity court herein.

World Wide and Mariani answered, denying they had breached the contract, and denied any damage had resulted to complainants from the alleged breaches of the contract as asserted by complainants. They averred that complainants had breached their contracts, and violated their duties thereunder as hereinafter noted. They denied that Dixie Shook & Box Company, a corporation, had possession of the leased property, and denied that such property was liable for attachment. They made their answer a cross bill and asserted that complainants had used the machinery and equipment of Mariana to manufacture materials for other persons, and had failed to pay to Mariani the rental of 1½% as provided in the contract between Mariana and complainants. The cross bill also asserted complainants had converted to their own use said machinery and equipment, and prayed for a personal decree for the rentals and for the value of the leased property.

Complainants, in their answer to the cross bills, denied they had broken the contracts in the manner alleged, but, in effect, admitted they had used to some extent the leased machinery and equipment in the manufacture of materials for parties other than in fulfillment of the contracts with World Wide. They denied they had converted the leased property.

Much testimony was taken and an extensive hearing was had upon the trial of the cause.

On the question of the breach of contract by World Wide the chancellor found that it breached its contract in (1) not furnishing a government inspector to examine the finished products at Crpstal Springs; (2) in not making sight draft guaranty arrangements with a local bank, as provided in the contract; (3) that World Wide wrongfully terminated the order given complainants to manufacture 48,000 boxes; that complainants did manufacture and deliver 8,640 of said boxes; that complainants lost in profits as a result of such breach of contract

the sum of $10,080.00; that (4) World Wide wrongfully terminated the purchase order to complainants, dated April 2, 1951, to manufacture and deliver 190,000 wood spacers, there being yet 142,833 spacers to be manufactured under said purchase order, resulting in loss of profits to complainants in the sum of $1,428.33; (5) that complainants did extra work and added extra materials in the manufacture of said 8,640 boxes, amounting to $3,067.20; (6) that complainants were not entitled to invoice No. 13, amounting to $733.94, the value of labor and materials in preparing boxes and spacers which complainants shipped to World Wide October 31, 1951, for the reason that ''such shipment was made to make up shortages that then existed from prior shipments'' by complainants; (7) that Mariani was entitled to a credit of $425.00 rent on the leased machinrey as result of use of the machinery in the manufacture of articles for other persons; (8) that complainants were entitled to a personal decree against World Wide and Mariani in the total net sum of $14,150.53; and (9) that the leased machinery and equipment, which complainants had attached, was liable to be subjected to the payment of the amount of said decree and the costs.

The chancellor appointed a commissioner to make sale of said machinery and equipment. It appears that subsequent to the final decree in the lower court the machinery and equipment were badly damaged in a fire.

From the final decree, as above shown, World Wide and Mariani appealed to this Court without supersedeas.

■■ Can complainants recover damages because of the failure of World Wide to have present at Crystal Springs a government representative to inspect the boxes as loaded under the purchase order for 48,500 boxes? We do not think so. In the first place this provision in the contract was mainly for the benefit of the government. The contract here was subject to a prime government contract. It was part of a national defense contract.

World Wide requested the Government to send an inspector, which the Government declined to do. World Wide had no way of compelling the Government to do that. The contract provided that "If for any reason no government inspection is required or made at the plant * * * " of complainants, "then the inspection certificate shall be that of an inspector designated by mutual consent of the parties * * ". Complainants never suggested to World Wide that a mutual inspector be selected.

■■ In addition to the foregoing we think complainants, by their subsequent conduct, waived the appointment of an inspector. The parties acted under this contract from February 16th to the latter part of October, or the first of November, 1951. Complainants made some nine shipments at various times pursuant to the arrangement between the parties. On May 30th complainants telegraphed World Wide they had shook ready to ship and to send an inspector or waive inspection. The next day World Wide wired that inspection was waived on that carload. On June 8 complainants wired World Wide "Arrange inspection or waiver of two cars next week". On June 12 complainants wired World Wide "Wire immediately waiving inspection car PRR 81187 loaded * * ". Same day World Wide wired complainants requesting information as to contents of that car and also the contents of the next car to be shipped. The requested information was furnished and the telegram also contained this statement "Inspection waived by you on both cars unless otherwise advised early tomorrow". The cars were shipped without inspection. On June 15 complainants wrote World Wide that if World Wide could not arrange for the government inspector, then that World Wide's bank should telegraph complainants' bank at Crystal Springs waiving inspection. We do not find in the record a reply to that telegram. On June 26 complainants wrote World Wide they had failed to load the two cars but had loaded another car, and on the same

day telegraphed World Wide suggesting waiver on the two cars to be shipped. The record is not clear whether this suggestion was followed, but presumably it was, since no inspection was made by a government inspector of any shipment at the point of origin. On July 24 complainants wired World Wide they had a "load of five thousand pounds" ready to be shipped and requested that inspection be waived and check be sent immediately. On July 30 complainants, in a letter to World Wide, made mention of the fact that an inspector had not been sent. But the next day complainants wired they had a railroad car load ready, and this was shipped without any inspection. On October 31 another shipment was made without inspection at origin. In other words, no inspection by a government agent was ever made at the source of origin and the dealings between these parties covered a period from February 16th to November 1.

In 17 C. J. S., pg. 992, Sec. 491, it is said "A party to a contract may waive provisions for his benefit; and likewise there may be a waiver of conditions or severable stipulations". See also Moore v. Y. & M. V. R. Co., et al, 176 Miss. 65, 166 So. 395; Tower Underwriters, Inc. v. Culley, 211 Miss. 788, 53 So. 2d 94; Oden Construction Co. v. Helton, 218 Miss. 41, 65 So. 2d 442; 12 Am. Jur. pg. 918, Sec. 354. A waiver may be inferred from the actions and conduct of the parties.

Waiver usually results when there is an intentional relinquishment of a known right. 17 C. J. S. pg. 995, Sec. 493. By preparation and shipment of the materials under the contract, without governmental inspection thereof, at Crystal Springs, and without requesting appointment of a mutual inspector, complainants, in our opinion, waived the provision for an inspector at the source of shipment.

It will be noted that World Wide, in paragraph 4 of the contract, obligated itself to arrange with the local bank of complainants to pay sight drafts drawn by com-

plainants when accompanied by bill of lading and a government inspector's certificate, where the commodity is required to be inspected by a government inspector. This arrangement was not made. However, we do not think, under the circumstances of this case, that this default entitled complainants to recover damages therefor.

The subsequent course of conduct and dealings between the parties waived the provision. This provision was coupled with the appointment of an inspector. There was no obligation to effect a guarantee unless inspector's certificate, showing the quantity of the manufactured materials and that the workmanship was of the quality called for in the contract, accompanied the draft. As above stated no inspector was appointed. Complainants, knowing a Government inspector had not been appointed, did not suggest that a mutually agreeable inspector be engaged. World Wide, of course, could not afford to pay for the materials without an inspector's certificate.

On May 11, 1951, World Wide sent to complainants a check for $2,500.00 "on account". This was accepted by complainants. This was an advance payment. On June 12 complainants wired World Wide they had a car ready and asked that inspection be waived and "Also wire money or bank Guarantee to Trucker's Exchange Bank for both cars". World Wide, by telegram, asked for the contents of the car. Complainants wired back the information, giving the amount owing complainants as $3,460.00 The next day World Wide, by air mail, sent check to complainants for $6,920.00. On June 6 complainants, by telegram, requestd World Wide to send check for $2,978.92 and for $2,329.00 for two cars complainants were ready to load. On June 12 complainants, by telegram, reminded World Wide check had not been received. On June 12 World Wide telegraphed complainants certified check had been air mailed to them the night before. On July 20 complainants requested that

World Wide wire them $3,187.50. That was done July 24. On July 30, after friction had developed between the parties, largely because of faulty materials and workmanship in the manufacture of shook and boxes, complainants noted in a letter that World Wide had not furnished the banking arrangement. However, the next day complainants wired World Wide to send immediately to them $4,200.40 for materials they were ready to load. On August 2 World Wide, by air mail, sent a check to complainants for the $4,200.40 and also one in the amount of $3,187.50 for a shipment to be made August 7th. There is an invoice in the record, dated October 31, 1951, which presumably is for materials that day shipped, amounting to $733.94. All of this means that the parties waived the provision for guaranty payments by a local bank. No payment was ever made in that manner. See the rule as to waiver above set out. In addition to this, there is no certainty whatever that complainants suffered any damage because of failure to make such arrangement. Some of the remittances made direct to complainants were payments in advance of the manufacture and loading of the materials. The guaranty provision was waived by complainants.

■■ ■ It is contended World Wide wrongfully terminated the arrangement and is liable for profits complainants would have realized had they been permitted to manufacture the remainder of the 48,000 boxes. They did manufacture 8640 boxes and the chancellor found that the profits would have been $10,080.00 had they manufactured the remainder of the ordered boxes. We do not think the proof shows World Wide terminated the arrangement. Apparently that was done by complainants —at least, complainants were agreeable to such termination. The Eisen order for purchase of said boxes contained this provision ''The above prices are firm for the life of this contract, subject, however, to a maximum increase of 10% to cover additional cost of seller's labor

and material upon prior notification''. This provision was not in the purchase order of World Wide to complainants. However, that order stated it was a subcontract under the Eisen prime contract, and World Wide seems to have adopted the attitude that complainants were entitled to the benefits of that provision. The Government inspector had found many defects in materials and workmanship which went into the manufacture of the boxes under the direction of complainants. Complainants shipped other boxes to replace the defective boxes. Complainants were much dissatisfied over this situation. World Wide, on September 14, by telegram, inquired whether complainants were willing to proceed with the manufacture of the 48,000 boxes on the basis of a 10% increase in the price fixed by the contract between World Wide and complainants. The telegram said ''10% is the maximum permissible increase under our contract with Eisen''. Complainants, by telegram dated September 15, informed World Wide the increase would not equal the cost of producing the boxes ''plus Hennington and Russum time and expenses''. The telegram said World Wide and the Government should not expect them '' * * to manufacture shook below cost''; that they should be paid $2.75 per unit, but that they were willing to proceed to manufacture the shook ''on a cost basis to enable us to finish contract, provided can load two cars per week and payment for shook be made when loaded''. World Wide took up with Eisen the question of the increase in price. The arrangement could not be made. Thus, two things are established by this telegram from complainants—first, that they were unwilling to, and would not, carry out the contract at the prices stated in the contract with World Wide and that they terminated the arrangement so far as they were concerned, and, second, had they been compelled to perform the contract and manufacture the remainder of the 48,000 boxes, they would have lost a great deal of money. We might add that

World Wide thereafter requested complainants to come to New York with the intent to try to work out a new arrangement. Russum did go to New York but no new arrangement was made. Under these circumstances we think it was error to inflict damages upon World Wide on the ground that it wrongfully terminated the contract. Termination was by complainants and no damage would have resulted to complainants had World Wide terminated the contract. On the other hand, had complainants carried out the contract they, according to their statements, would have suffered large financial losses. According to their own statement they profited greatly by nonfulfillment of the contract.

However, the chancellor found, at least by inference, that complainants were ready, able and willing to fulfill the purchase order for spacers. The order called for manufacture by complainants of 190,000 spacers. Complainants did manufacture and deliver 47,167, leaving 142,833 yet to be manufactured and delivered. The chancellor found that had complainants manufactured and delivered the remainder of that purchase order, to-wit 142,888, as they could and would have done, there would have been a profit to them of $1,428.33. The chancellor was justified in so finding. However, since we have held that complainants failed to carry out the contract to manufacture and deliver 48,000 shook, covered by a purchase order under the contract of February 16th, the question arises whether the order for the spacers is severable from the purchase order for the shook.

■■ ■ 17 C. J. S., Contracts, Sec. 332, p. 788, says: "Primarily the question of whether a contract is entire or severable is one of intention, to be determined from the language which the parties have used and the subject matter of the agreement. ■■ ■ A contract may both in its nature and in its terms be severable and yet rendered entire by the intention of the parties, or, by agreement, express or implied, the parties may render

divisible a contract which as originally drawn in the first instance was entire.''

■■■ We think that the parties here have made the contract divisible as to each purchase order and that each purchase order stands alone, for instance: The contract between World Wide, Mariani and Russum & Hennington, dated February 16, 1951, provides in Sec. 2 as follows: ''The price of shook to the first party shall at no time be higher than that quoted by the second party to other bona fide purchasers. Each order shall be negotiable as to price before acceptance.''

Thus as between the parties no purchase order was to be accepted and become binding until the price with respect to that particular order was agreed upon. Of course, as to the purchase order for 48,000 shooks, the price was fixed in the contract at $2.12½ per box, f. o. b. Crystal Springs.

In Sec. 4 of the contract as heretofore set out, provides: ''If for any reason no government inspection is required or made at the plant of the second party, then the inspection certificate shall be that of an inspector designated by mutual consent of the parties, and the inspection report shall certify that the materials inspected comply with the specifications outlined in the particular contract under which the shipment is being made, and also certifying to the quantities involved in such shipment.''

Sec. 12 of the contract reads as follows: ''Each party may terminate this contract upon 60 days written notice given by registered mail to the other, whereupon this agreement shall come to an end, except that all unfinished contracts or orders of World Wide previously accepted shall be completed as contracted and all payments thereunder shall be made.''

We think the two purchase orders were severable and the chancellor was justified in finding complainants lost a profit of $1,428.33 on the spacers.

The question as to what was covered by the order for 48,000 shook, or boxes, as the subject-matter was described in the contract and purchase order, was presented to the lower court and is presented to us. In other words, complainants claim that they were required by World Wide to, and they did, add much extra materails, to, and perform much extra labor upon, the 8640 articles they delivered under the 48,000 purchase order, over and above what was called for in the order. The chancellor sustained the contention of complainants and awarded them a personal decree for the extra materials and labor in the sum of $3,067.20. A great amount of testimony was taken upon the stated question. We deem it unnecessary to set it out in detail. It is sufficient to say that we think the testimony amply sustains the conclusions reached by the able chancellor.

The chancellor found that Mariani was entitled to a credit of $425.00, rent on the leased machinery, as a result of its use in manufacturing products for other parties. He also found that the attachment against the leased machinery and equipment was rightlfully sued out and that the machinery and equipment were liable to be subjected under such attachment to the personal decree rendered against World Wide and Mariani. We do not find that he committed error in so holding.

This means that complainants are entitled to a personal decree against World Wide and Mariani for the sums of $1,428.33, spacer profits, and $3,067.20, compensation for extra work and labor upon the 8640 articles delivered under the 48,000 purchase order, less $425.00 credit to Mariani for machinery rental, or a net personal decree of $4,070.53, with legal interest thereon from September 2, 1955, the date of the final decree in the lower court in this cause, and that the attached machinery and equipment or the proceeds thereof, if already sold, may be subjected to the payment of such personal decree. The costs of this appeal will be assessed two-thirds

against complainants, the appellees, and one-third against World Wide and Mariani, the appellants.

Affirmed in part and reversed in part and final judgment here.

*Lee, Holmes, Arrington* and *Ethridge, JJ.,* Concur.

ON SUGGESTION OF ERROR

Lee, J.

■ ■■ Appellants, in their suggestion of error, among other things, contend that "The court erred in failing to hold that World Wide recover from appellees the sum of $530.00 freight paid by World Wide on the shipment of additional shook and spacers, which were delivered on or about October 31, 1951 to make up shortages which then existed from prior shipments."

The shortages in question arose on account of an insufficient number of such articles an also defects in some of them.

Under the contract, delivery of the manufactured articles was to be made at Crystal Springs, where it was contemplated that an inspection would occur. In view of the course of dealing between the parties, that is, the appellees' failure to insist on such inspection at that point, the original opinion held that the appellees were not in position to maintain that the appellants had breached their contract in failing to inspect at the place of delivery, namely, Crystal Springs. However this does not mean that the appellees agreed that the inspection should be made at the ultimate destination of the merchandise. In practice, the appellants had not made inspections conditions precedent to payment.

There is a twofold answer to this proposition. If the appellees failed to ship enough shook and spacers obviously the appellants did not pay the freight on such shortage in quantity as was not shipped. Consequently there was no double payment of freight in that instance.

But besides if the inspection had been made at Crystal Springs, the place of delivery under the contract, the alleged shortage both in material and quantity would have been discovered, and no expense for freight on such shortage would have accrued. It therefore follows that the trial court was justified in refusing to permit the appellants to recover for this freight charge, which would have been obviated by an inspection at the point of delivery.

Suggestion of error overruled.

*Roberds, P. J.,* and *Holmes, Arrington* and *Ethridge,* JJ., concur.