655 So.2d 25 (1995)
Joseph C. CANIZARO
v.
MOBILE COMMUNICATIONS CORPORATION OF AMERICA, BellSouth Corporation and BLS Acquisition Corp. I, Inc.
No. 91-CA-00742-SCT.
Supreme Court of Mississippi.
March 30, 1995.
Rehearing Denied May 18, 1995.
*26 James L. Young, John F. Simon, Jr., Young Scanlon & Sessums, Jackson, for appellant.
Lawrence J. Franck, Leslie Joyner Bobo, A. Camille Henick, Butler Snow O'Mara Stevens & Cannada, Jackson, Jack Wallach, Atlanta, GA, for appellee.
Before HAWKINS, C.J., and McRAE and JAMES L. ROBERTS, Jr., JJ.
HAWKINS, Chief Justice, for the Court:
Joseph C. Canizaro filed suit against Mobile Communications Corporation of America ("MCCA"), BellSouth Corporation ("Bell-South") and BLS Acquisition Corp. I, Inc. ("BLS") in the circuit court of the First Judicial District of Hinds County, Mississippi. The complaint alleged that MCCA had breached a contract to enter into a lease with Canizaro, and that BellSouth and BLS had tortiously interfered with said contract. After discovery, all three defendants made a motion for summary judgment. The trial judge granted the defendants' motion for summary judgment. Canizaro now appeals the court's ruling.

FACTS
On March 18, 1987, Canizaro and MCCA entered into an "Agreement to Enter Lease and Participation Agreement." The agreement contemplated that Canizaro would construct an office building in downtown Jackson, Mississippi, to be known as the "MCCA Tower," and that MCCA would be the building's principal tenant. Under the terms of the agreement, however, MCCA would not be obligated to "close" the lease until Canizaro obtained the necessary financing for the building construction. The agreement stated in part:
8. Closing Date

The closing ("Closing") of the transaction contemplated herein shall occur at the offices of MCCA 1700 Capital Towers Building, Jackson, MS 39201 at the earlier of 120 days from the date hereof or within ten (10) days following the date MCCA issues its final written approval to the transaction contemplated by this Agreement (the "Closing Date"). The closing date may be extended for an additional 60 days if construction financing shall not have been committed, and the CANIZARO Interests are diligently pursuing the availability of such financing.
....
10. Default

....
Without limitation of the foregoing and notwithstanding any other provisions in this Agreement, MCCA acknowledges that CANIZARO has, in this Agreement undertaken certain obligations and have [sic] made certain covenants and representations which he may be unable to keep and perform by the Closing Date after asserting their best efforts to do so in good faith. In such event, absent the occurrence of an Event of Default, and if the Event of Default has not been waived by MCCA, then either party may terminate this Agreement by written notice to the other. Upon any such termination, this Agreement shall become null and void and of no further force or effect, and the parties shall be relieved of their respective obligations and liabilities hereunder.

....
12.9 If full performance of this Agreement is not completed by the Closing Date and is not otherwise excused, either party shall have the right after that date to declare time to be of the essence of this Agreement by giving written notice to the other party. Such notice shall contain a declaration that time is of the essence and shall fix the time, date and place of final settlement, which date may not be sooner than fifteen (15) days nor later than thirty (30) days following the effective date of giving such notice. (Emphasis added).
The conclusion of the agreement stated that no modifications or waivers with respect to the agreement would be effective unless in writing and signed by the party to be charged. The agreement was executed by Canizaro and John N. Palmer, president of MCCA.
*27 During the first 120 days after the agreement was executed, both Canizaro and MCCA took various steps with regards to closing the agreement and completing the design of the building. As financing was not obtained within this period, however, a sixty-day extension on the closing date was approved. The closing was then scheduled to be completed by September 15, 1987. During September 1987, Canizaro and his associates were actively engaged in the process of obtaining financing for the project; however, a financing commitment was not finalized by September 15. Nonetheless, MCCA agreed to extend the deadline to October 15, 1987, in a letter dated September 16, 1987. In doing so, MCCA also placed Canizaro on notice that time was of the essence, but did not inform Canizaro that the contract would be terminated if financing was not obtained by the new deadline. Financing was not obtained by October 15.
In any event, MCCA and Canizaro continued "working towards trying to make the project a reality," after the October 15 deadline. In particular, Canizaro alleges MCCA retained the services of its architect and designer, and continued to make changes with respect to the floor-plans of the building. MCCA representatives also continued to participate in construction conferences with Canizaro's representatives. In November 1987, Palmer and Canizaro took a trip to Nashville, Tennessee, to inspect a building which had been designed by the firm that was to design the MCCA Tower. During this period, Canizaro and Palmer continued to discuss financing for the project, but Palmer did not establish any new deadlines. In his deposition, Palmer also admitted that he did continue to pursue new tenants for the building. Palmer never informed Canizaro that "the deal [was] off."
In December 1987, Canizaro and MCCA held a public ground-breaking ceremony on the MCCA Tower building site. According to Palmer, the event was attended by the mayor of Jackson and various other dignitaries, and received at least some coverage by the media. At the ceremony, the parties expressed their intention of "going forward with the building." Prior to the ceremony, MCCA's in-house counsel, Rubel Phillips, informed Palmer that he did not believe the parties should have such a ceremony until a financing commitment had been reached. Phillips believed that the ground-breaking would have great significance to the public, and he did not wish to send the "wrong signals."
During the last months of 1987, MCCA and Palmer were also in contact with BellSouth, specifically Roger Hale, a vice president with BellSouth. According to Hale, the October 1987 stock market crash had made the acquisition of MCCA an attractive prospect. However, it appears BellSouth preferred that MCCA not engage in the lease agreement with Canizaro.
On December 30, 1987, MCCA's outside counsel, Dennis Ford, sent Canizaro a letter on behalf of MCCA stating that Canizaro had had since October 15 to obtain financing. Although the letter also stated that the agreement between the parties had expired, Ford instructed Canizaro that MCCA would still enter into a lease if a financing commitment satisfactory to MCCA could be obtained by January 30, 1988. Under the terms of the letter, the offer was made "without intending any legal significance or ratification of the prior agreements." Palmer stated that Canizaro was not consulted prior to this demand letter being sent.
A few days after he received the December 30 letter, Canizaro met with Palmer in New Orleans, Louisiana, at a football game. At this meeting, Canizaro requested that he be given until the end of February to obtain financing. According to Canizaro, Palmer responded, "No problem, you can have till February the 28th." Palmer admitted that he told Canizaro not to worry about the deadline.
On January 14, 1988, BellSouth made a formal proposal to acquire MCCA. One portion of the proposal required MCCA to:
[T]ake all necessary action to terminate all existing or proposed commitments with regard to the planned new MCCA building in Jackson, Mississippi. This action shall be taken without recourse to MCCA.
*28 As a result of this proposal, Palmer telephoned Canizaro and informed him that he would have to enforce the January 30 deadline contained in the letter of December 30. Negotiations between MCCA and BellSouth began shortly thereafter. However, on January 28, 1988, negotiations were terminated, and BellSouth withdrew its offer to acquire MCCA.
On January 29, 1988, Canizaro presented MCCA with a financing commitment for $38,500,000.00 from Unifirst Bank for Savings ("Unifirst"). Three days later, on February 1, MCCA rejected the proposed loan commitment. In the letter he wrote to Canizaro, Ford stated that the commitment failed to:
[M]eet the terms of the original agreement to enter partnership, does not meet with the corporation's approval, and therefore does not fulfill the conditions required in my correspondence of December 30, 1987 for MCCA to go forward with leasing space in the proposed Tower ...
MCCA hereby gives you notice that all of its obligations to Joseph C. Canizaro Interests have terminated.
Specifically, MCCA contended that the commitment contained several illusory provisions that would have allowed Unifirst to totally avoid funding the project.
Three weeks later on February 18, MCCA and BellSouth resumed their negotiations. On February 19, the two corporations announced that plans for a merger had been reached.
In October 1988, Canizaro filed suit against MCCA, BellSouth, and BLS, a holding company formed to effectuate the merger between MCCA and BellSouth. Canizaro alleged that MCCA had breached its contract with Canizaro, and that BellSouth and BLS had tortiously interfered with the contractual relationship. After a lengthy discovery period, all three defendants moved for summary judgment. The trial court granted the defendants' motion. In its order, the court found that the contract between Canizaro and MCCA had expired on October 15, 1987. Although Canizaro contended that MCCA's conduct after October 15 amounted to a waiver, the court stated:
Plaintiff cites numerous events and facts which occurred between October 15, 1987 and December 30, 1987. These facts are undisputed but they are immaterial. We find that neither singularly nor cumulatively do any facts cited by the plaintiff rise to a level sufficient to constitute a waiver and estoppel of the defendant's right to claim that the contract expired as of October 15, 1987.
The letter of December 30, 1987, the court concluded was a new offer, conditioned upon MCCA's personal satisfaction. With respect to BellSouth and BLS, the court found that Canizaro's claim for tortious interference failed as the contract between Canizaro and MCCA had expired on October 15.

LAW

Standard of Review
Under Mississippi Rule of Civil Procedure 56, a movant is not entitled to summary judgment unless he can demonstrate that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. However, it is equally clear that summary judgment is inappropriate when there are undisputed facts which are susceptible to more than one interpretation. In Dennis v. Searle, the Court stated:
Issues of [material] fact, as a matter of proper construction of Rule 56, also exist where there is more than one reasonable interpretation that may be given undisputed testimony, where materially differing but nevertheless reasonable inferences may be drawn from the uncontradicted facts ...
457 So.2d 941, 944 (Miss. 1984); American Legion Ladnier Post Number 42, Inc. v. City of Ocean Springs, 562 So.2d 103, 106 (Miss. 1990) (holding that in doubtful cases trial court should err on side of denying summary judgment). Furthermore, this Court conducts de novo review of summary judgments awarded by trial courts. Short v. Columbus Rubber and Gasket Co., Inc., 535 So.2d 61, 63 (Miss. 1988). And should it determine that the undisputed facts can support more than one interpretation, the Court will not hesitate *29 to reverse and remand for a trial on the merits.

Waiver
In the instant case, Canizaro argues that even if MCCA had the right to terminate the contract on October 15, its conduct between October 15, 1987, and December 30, 1987, amounted to a waiver of that right. Canizaro contends that the final determination of this matter should have been settled by a jury, and therefore, summary judgment was inappropriate.
As support for his position, Canizaro cites the Court to Gannaway v. Toler, 122 Miss. 111, 84 So. 129 (1920). In Gannaway, the owner of a parcel agreed to sell the land to two vendees based upon an installment sale contract. Although the vendees promptly paid the first installment, they neglected to include the accrued interest. The owner accepted the payment, however, he failed to cash the check and raised no objection for three months. He then sought to invalidate the agreement. In affirming the lower court's decision to grant specific performance to the vendees, this Court stated:
The rule seems to be well settled in all jurisdictions that the vendor, who has the whiphand in the optional contract of forfeiture, must exercise his option promptly after default is made by the vendee; otherwise his failure to do so is taken to evidence his purpose of continuing the contract, which amounts to a waiver of his rights to declare forfeiture ... The delay of three months in declaring the forfeiture was unreasonable. Such conduct does not square wholly with good conscience in dealings between man and man.
Gannaway, 84 So. at 131. The appellees argue that Gannaway is distinguishable from the case sub judice as Gannaway was a suit in equity rather than an action at law. This argument, however, fails to recognize that fundamental consideration in both cases is and was the legal significance of the parties' conduct as to their respective agreements. With respect to waivers in general, this Court has long held that a party to a contract may by words or conduct waive a right to which he would otherwise have been entitled. See Mariana v. Hennington, 229 Miss. 212, 90 So.2d 356, 362 (1956) (holding that party may waive beneficial contract provisions by actions and conduct); Partee v. Pepple, 197 Miss. 486, 20 So.2d 73, 78 (1944) (holding that contract deadline may be waived by parol or conduct).
In the case at bar, the facts tend to be much more persuasive than those in Gannaway. When Canizaro failed to obtain financing by the October 15 deadline, MCCA could have terminated the agreement under paragraph 10 of the contract. However, MCCA did not give Canizaro the required notice. Instead, MCCA and its representatives continued to actively conduct business with Canizaro just as if the deadline had not passed. In particular, Palmer continued to assure Canizaro that MCCA wished to go forward with the project, and even made this intention public at the ground-breaking ceremony. Consequently, it appears from the record that a jury could reasonably infer that MCCA did waive its right to terminate the contract by continuing to conduct business as usual with Canizaro after the October 15 deadline. And as Canizaro must be given the benefit of all reasonable inferences, the trial court's decision to grant summary judgment was erroneous, and must be reversed.
Interestingly, the appellees contend that the purported waiver was of no effect as it was not in writing. They first point to the contract's own provision which required any modification or waiver to be in writing. However, the appellees fail to recognize that the writing requirement contained in the contract could itself be waived by the subsequent conduct of the parties. Eastline Corp. v. Marion Apartments, Ltd., 524 So.2d 582, 584 (Miss. 1988).
The appellees also contend that as the underlying contract between the parties was within the Statute of Frauds, any modification or waiver of said contract would also have to be in writing. See Miss. Code Ann. § 15-3-1(c) (1972). With respect to a modification, they are correct. However, the instant case concerns a purported waiver. See generally E. Allan Farnsworth, Contracts § 8.5 (1982) (discussing distinction between *30 modification and waiver). Although we have not addressed this exact question previously, there seems no doubt that a party may waive the protection of the Statute of Frauds. In transactions governed by the Mississippi Uniform Commercial Code, the Statute of Frauds does not preclude a waiver of rights. Miss. Code Ann. § 75-2-209(4) (1972). Furthermore, if a party fails to raise the Statute of Frauds as defense in his answer to a complaint, he will be deemed to have waived the defense. Miss.R.Civ.P. 8(c). In examining this very issue, the Supreme Court of Vermont determined that waiver and estoppel operated "independently" of the Statute of Frauds. North v. Simonini, 142 Vt. 482, 457 A.2d 285, 287 (1983). According to one treatise on this subject:
The cases suggest that courts are often hostile to strict application of time clauses in contracts. They frequently find waivers of the essentiality of time, both from written or oral statements of waiver and from the surrounding circumstances. The statute of frauds is typically held no barrier to such waivers. Silence or failure to demand strict performance may be construed as a waiver, particularly where the opposing party is under the reasonable impression that timely performance will not be insisted upon ... Once a waiver has been made, the waiving party can reinstate the essentiality of time only by notifying the other party of his intention to do so and stating a reasonable time for the latter to come into compliance.
Roger A. Cunningham et al., Law of Property, § 10.9 (1984). Consequently, we find that the Statute of Frauds does not operate to prevent a party from unilaterally waiving his rights under a contract.
Accordingly, the summary judgment entered by the trial court in favor of MCCA is reversed. Furthermore, as the summary judgment entered in favor of BellSouth and BLS was contingent upon the summary judgment entered in favor of MCCA, it too is reversed.
On remand, the lower court should consider the legal import of the December 30 letter to Canizaro, among other things. In particular, the court should consider whether the letter amounted to a retraction of a prior waiver, or whether the letter amounted to a new offer. See Tower Underwriters, Inc. v. Culley, 211 Miss. 788, 53 So.2d 94, 97 (1951) (holding that party which acquiesced in breach could not terminate contract without reasonable notice of intent to enforce contract); Restatement (Second) of Contracts § 150 cmt. c (1981) (stating that waiver may be revoked after reasonable notification). Additionally, the court should address the sufficiency of the loan commitment which Canizaro tendered, bearing in mind this Court's holding in McFadden & Oates v. Ray, 184 Miss. 352, 185 So. 245 (1939).
REVERSED AND REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
DAN M. LEE, P.J., and SULLIVAN, PITTMAN, BANKS, McRAE, JAMES L. ROBERTS, Jr., and SMITH, JJ., concur.
PRATHER, P.J., not participating.