# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-CA-01294-SCT

*BRENT TOWING COMPANY, INC.*

*v.*

*SCOTT PETROLEUM CORPORATION*

| | |
|---|---|
| DATE OF JUDGMENT: | 09/17/97 |
| TRIAL JUDGE: | HON. FRANK G. VOLLOR |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | E. RANDOLPH NOBLE, JR. |
| ATTORNEYS FOR APPELLEE: | CHARLES VICTOR McTEER |
| | KIMBERLY G. JONES |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 4/8/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/29/99 |

**BEFORE PRATHER, C.J., BANKS AND McRAE, JJ.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. Before us is a case that revolves around a contract clause. Appellee Scott Petroleum Corporation ("Scott") filed a complaint for declaratory judgment pursuant to paragraph six ("¶ 6"), an environmental clean-up clause, of a Contract of Sale between Scott and Appellant Brent Towing Company, Inc. ("Brent") . Summary judgment was granted Scott. Brent appealed. We affirm pursuant to ¶ 6 of the contract and in light of the judgment of the court below.

## STATEMENT OF THE CASE

¶2. On November 16, 1994, Scott filed a complaint for declaratory judgment against Brent pursuant to ¶ 6 of a contract of sale between Scott and Brent. Scott requested that the contract be declared valid and the possibility of Brent being required to indemnify Scott confirmed. The parties filed motions for summary judgment, which were denied February 27, 1996. In 1997, the parties once again filed motions for summary judgment. On September 17, 1997, Washington County Circuit Court Judge Frank Vollor granted summary judgment to Scott while declaring that the parties' original contract of sale remained valid and enforceable. In October, 1997, Brent filed a notice of appeal.

## STATEMENT OF THE FACTS

¶3. In 1979, Brent Terminals, a sister corporation to Brent Towing ("Brent"), purchased property from Chevron to store nitrate fertilizers being moved down the river. Chevron previously used the property for tank storage of petroleum products, including diesel fuel and gasoline, and maintained a terminal there. However, at the time of purchase, no inquiry was made of Chevron as to whether the property was contaminant free. The property was later transferred to Brent Towing just before Brent Towing's 1988 sale of the property to Scott Petroleum.

¶4. Scott's reason for purchase was to salvage the large above-ground tanks and other terminal equipment, then resell the land. Brent states that no investigations regarding contaminants were made from Chevron's sale to Scott's purchase of the property. Further, Brent did not use the tanks from approximately the years 1986 to 1988. Brent states that at the time of sale to Scott, the tanks were free of contaminants; although, Brent is unsure of whether the property was free of contaminants at that time.

¶5. The contract of sale between Brent and Scott was effected November 17, 1988. The property at issue, known in the contract as "Seller's Bulk Terminal Facility," covers approximately 8.842 acres, and is located at 942 North Broadway, in Section 2 and 3, Township 18 North, Range 8 West, in Greenville, Mississippi. Among documents related to the contract were a Promissory Note, a Security Agreement, a Land Deed of Trust, and a UCC Financing Statement. Paragraph 6 of the contract deals with the issue of site cleanup indemnity of Scott by Brent.[1]

¶6. Pursuant to the contract, Scott made three full payments of principal and interest. The final payment of $150,000.00 plus interest was due December 1, 1990. Scott sought and received a payment deadline extension from December 1 to December 31. On January 8, 1991, Scott paid $51,273.97 of the requisite amount. Scott states that it withheld the remaining $100,000.00 because Brent would not offer proof of its capability to satisfy its ¶ 6 indemnification responsibilities. Scott held the money pending a site assessment by Hess Environmental Services. Brent, on the other hand, states that it never refused to provide information as to its capability to indemnify; Brent maintains that it simply wished to be paid the money owed it before providing the indemnification-related information. Further, Scott apparently sold some of its operation to another party--Farmkist--in 1991.

¶7. As to the property itself, from the time of Scott's purchase to this litigation, Brent's President, Howard Hays Brent, says he once drove by and saw spilled product--believed by him to be fertilizer--on the property after Scott purchased it. He further states that on at least ten different occasions after December 1990 he saw trucks and product-containing fiberglass storage tanks that were added by Scott. Yet, Scott has stated that it "at no time conducted any operations on the property which have in any way contributed to any contamination . . . . Of Chevron, Brent and Scott, only Scott conducted no activities which might have contaminated the property."

¶8. In 1991, Hess Environmental Services was retained by Scott to conduct an initial environmental assessment. Then, as early as October 1991, Chevron, Scott, and Brown began negotiations as to site assessments and cleanup plans requested by the Mississippi Department of Environmental Quality ("DEQ"). As of May 1993, Chevron had accepted the crux of the testing costs. A follow-up assessment paid for by Chevron and conducted by Zimmerman Environmental Consultants, Inc., confirmed hydrocarbon contamination as it discovered arsenic, nitrite, and nitrate contamination. At some point, it was also determined that there is an underground tank on the property.

¶9. Due to Scott's failure to pay and its alleged breach of ¶ 5 of the contract by an unpermitted early 1991

tank removal, Brent initiated foreclosure proceedings via a May 3, 1993, certified mailing to Scott and by publishing notice on May 25, 1993, of an intended public sale of the property's tanks to be held on June 3, 1993. On May 28, 1993, Scott filed a Complaint for Temporary Restraining Order, Preliminary Injunction, Declaratory Judgment and Other Relief. As part of the foreclosure proceedings, Scott deposited $100,000.00 principal and $24,191.75 interest as bond with the chancery court. A June 2, 1993, Chancery Court Agreed Order dismissed Scott's Complaint and Brent's Counterclaim without prejudice; but, in that Order, Scott agreed to pay Brent the $124,191.75 previously deposited with the court, as well as $12,528.77 in attorneys' fees for a total of $136,720.52. Brent received the mandated sums.

¶10. In May 1994, DEQ conducted a site inspection. At the time of the November 1994 Complaint for Declaratory Judgment, no cleanup Order had been entered by either DEQ or the United States Environmental Protection Agency ("U.S. EPA"). In May 1996, Miss. DEQ sent a letter to Scott, Brett, and Chevron requesting each party, as a potentially responsible party ("PRP"), to produce a work plan within 45 days of the date of the letter. The work plan was to address systematically located soil samples and the installation and sampling of a monitoring well.

¶11. According to Scott's Complaint for Declaratory Judgment of November 16, 1994, Brent stated that it would not honor its indemnity duty under ¶ 6 of the contract even if a cleanup order was entered by either DEQ or U.S. EPA. Scott construed Brent's statement as an anticipatory repudiation. Brent insisted that any potential cleanup costs were not its responsibility as it argued that ¶ 6 of the contract of sale was null from Scott's failure to pay, i.e., Scott's default, without foreclosure action. Indeed, Brent has stated that had Scott not defaulted by failing to pay the money due within the 30 day extension, Brent would have held the contract of sale valid and indemnified--if so directed by counsel--Scott for environmental costs as per the language of ¶ 6.

## DISCUSSION OF THE LAW

WHETHER THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO SCOTT WHILE DENYING IT TO BRENT.

¶12. This case is before us pursuant to a Miss. R. Civ. P. 56 Motion for Summary Judgment. We recognize that motions for summary judgment challenge "the legal sufficiency of all or part of an opponent's case." *Dawkins & Co. v. L & L Planting Co.*, 602 So.2d 838, 841 (Miss.1992). This Court utilizes a *de novo* standard in reviewing a grant of summary judgment. *Allen v. Mac Tools, Inc.*, 671 So. 2d 636, 640 (Miss. 1996); *Owen v. Pringle*, 621 So. 2d 668, 670 (Miss. 1993). "A trial court may grant summary judgment if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Roussel v. Robbins*, 688 So. 2d 714, 725 (Miss. 1996). "The motion for a summary judgment challenges the very existence of legal sufficiency of the claim or defense to which it is addressed; in effect, the moving party takes the position that he is entitled to prevail as a matter of law because his opponent has no valid claim for relief or defense to the action, as the case may be." *Brown v. Credit Center, Inc.*, 444 So.2d 358, 362 (Miss. 1983). "When reviewing an award of summary judgment, this Court views all evidence in the light most favorable to the non-movant, including 'admissions in pleadings, answers to interrogatories, depositions, affidavits, etc.' and will presume that all evidence in the non-movant's favor is true." *Allen*, 671 So. 2d at 640. Where there is doubt whether a fact issue exists, the non-moving party is the beneficiary of that doubt. *Id.* at 640. If any triable issues of fact exist, the lower

court's decision to grant summary judgment will be reversed. *Id.* at 640. Otherwise, this Court affirms the decision. *Id.* at 640. "Notwithstanding our respect for and deference to the trial judge, on matters of law it is our job to get it right. That the trial judge may have come close is not good enough." *Cooper v. Crabb*, 587 So. 2d 236, 239 (Miss. 1991) (*quoting UHS-Qualicare, Inc. v. Gulf Coast Community Hosp., Inc.*, 525 So. 2d 746, 754 (Miss. 1987)).

¶13. Brent claims on appeal that Scott breached the contract between the parties by defaulting on the contract for two and one-half years. Brent argues it fostered a foreclosure action under the promissory note and security agreement that led to the Agreed Order and Scott's payment pursuant thereto. Scott counters that the contract is satisfied and valid because all monies required thereby have been tendered Brent. Thus, Scott argues, the full payment renders Brent obliged to satisfy the environmental indemnity provision located in contract ¶ 6. Scott couches the situation as one in which Brent chose repayment, or "cure," over rescission, thus it feels Brent has repudiated the contract by stating it will no longer abide by ¶ 6. Hence, Scott feels that Brent's choice of repayment coupled with no obligation to meet the contract provisions would place Brent in a better position than it would have been but for the breach.

¶14. This Court acknowledges that "[i]t is said to be the general rule that where a contracting party, with knowledge of a breach by the other party, receives money in the performance of the contract, he will be held to have waived the breach." 17A Am. Jur. 2d *Contracts* § 663, at 669 (1991) (footnote omitted). Further, in *Mariana v. Hennington*, 229 Miss. 212, 90 So.2d 356 (1956), we stated:

> In 17 C.J.S., *Contracts*, § 491, p. 992, it is said "A party to a contract may waive provisions for his benefit; and likewise there may be a waiver of conditions precedent or severable stipulations." *See also Moore v. Yazoo & M.V.R. Co.*, 176 Miss. 65, 166 So. 395; *Tower Underwriters, Inc., v. Culley*, 211 Miss. 788, 53 So. 2d 94; *Oden Construction Co. v. Helton*, 218 Miss. 41, 65 So. 2d 442; 12 Am. Jur. pg. 918, Sec. 354. A waiver may be inferred from the actions and conduct of the parties. Waiver usually results when there is an intentional relinquishment of a known right. 17 C.J.S., *Contracts*, § 492, p. 995.

*Id.*, 229 Miss. at 226, 90 So. 2d at 362. *See also Canizaro v. Mobile Communications Corp. of America*, 655 So. 2d 25, 29 (Miss. 1995); and *Gannaway v. Toler*, 122 Miss. 111, 138, 84 So. 129, 131 (1920). In *Matheney v. McClain*, 248 Miss. 842, 161 So. 2d 516 (1964), we further stated:

> It is said as a general rule that "Strict and full performance of a contract by one party may be waived by the other party." 12 Am. Jur., *Contracts*, § 353, at p. 919. Again it is said: "A party to a contract who, after discovery or knowledge of facts which would entitle him to rescind, treats the contract as a subsisting obligation and leads the other party to believe that the contract is still in effect waives his right to rescind." 12 Am. Jur., *Contracts*, § 449, at p. 1031. . . .

*Id.*, 248 Miss. at 848, 161 So. 2d at 519.

¶15. In the instant case, Brent accepted payment by Scott. Such acceptance was an effective waiver of any breach by Scott. Brent chose to rectify the situation by completing the contract. Brent may not now change its mind and eschew the contract. To so do would be contra justice because such action would give license to future parties to do whatever they want when their opposite parties breach any respective contract. Hence, the trial court properly decided this case. There are no genuine issues of material fact as Brent accepted Scott's cure. The contract at issue is valid and must be honored. In light of our decision, it is

appropriate to quote the circuit court, which deftly dealt with the instant case when it stated:

> The Court finds that any breach by Scott was cured by the payments made by Scott to Brent pursuant to the settlement of the Foreclosure Action and that Brent waived the material breach of Scott, if any by accepting Scott's payment of One Hundred Thirty-six Thousand Seven Hundred Twenty Dollars and Fifty Cents ($136,720.50). Having accepted said payment, as opposed to rescinding the contract for non-payment, Brent cannot now refuse to honor the full and complete terms of the contract. Brent was paid interest and its attorneys' fees as well as the principal amount due and owing. There is no indication that Brent has been at all prejudiced as a consequence of the breach.

## CONCLUSION

¶16. As previously analyzed and explained, the trial court properly handled the instant case. Scott cured any breach of contract such that all contract language is valid. Scott may utilize and hold Brent to the language of ¶ 6 of the contract. Accordingly, we affirm the trial court's grant of summary judgment to Scott.

¶17. **JUDGMENT IS AFFIRMED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, SMITH, AND WALLER, JJ., CONCUR. MILLS AND COBB, JJ., NOT PARTICIPATING.**

1. Paragraph 6 says:

> Seller [Brent] shall be responsible for any cleanup or corrective action ordered by the Environmental Protection Agency, or any other Federal, State or local agency or public body relating to the property sold to Purchaser [Scott] pursuant to this Contract as a result of the ownership, operation or use of said property prior to the sale to Purchaser, whether or not any such order be directed towards the record owner of the property or to Seller. Seller shall indemnify and hold harmless Purchaser, its successors and assigns, against any and all damages, debts, liabilities, fines, expenses, legal fees, court costs, or claims of any nature against Purchaser which may arise out of any clean up or corrective action order entered by any such governmental body, authority or agency. The obligation of this paragraph shall survive the closing of the sale from Seller to Purchaser. Purchaser, its successors and assigns, shall promptly notify Seller of any such notice, order, letter, demand, or claim whatsoever concerning any cleanup or corrective action concerning the property covered by this Contract.